**ARENT FOX LLP**
Robert M. Hirsh, Esq.
Russell P. McRory, Esq. (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, NY  10019-60022
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: robert.hirsh@arentfox.com
Email: russell.mcrory@arentfox.com

*Proposed Counsel to the Debtor and*
*Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| CTE 1 LLC, | Case No. 19-30256-VFP |
| Debtor. | (Honorable Vincent F. Papalia) |

**DEBTOR'S MOTION FOR, *INTER ALIA*: (I) AN ORDER (A)
SCHEDULING A SALE AND AUCTION OF CERTAIN ASSETS OF
THE DEBTOR; (B) APPROVING BIDDING PROCEDURES;
(C) AUTHORIZING AND APPROVING BID PROTECTIONS; (D)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND
(E) APPROVING FORM AND MANNER OF NOTICE; AND (II) A
SECOND ORDER APPROVING (A) THE SALE OF SAID ASSETS
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
AND (B) THE ASSUMPTION OF ASSUMED CONTRACTS
<u>PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE</u>**

CTE 1 LLC, the debtor and debtor-in-possession (the "<u>Debtor</u>" or the "<u>Company</u>"), by

and through its undersigned proposed counsel, pursuant to sections 105(a), 363, and 365 of title

11, United States Code (the "<u>Bankruptcy Code</u>"), by this motion (the "<u>Sale Motion</u>") seek the entry

of: (I) an Order (the "<u>Sale Procedures Order</u>") in substantially the same form as attached hereto as

**<u>Exhibit A</u>**, (A) scheduling a sale date for the sale of substantially all of the Debtor's tangible and

intangible assets (as defined in the Stalking Horse Agreement (defined below), the "Purchased Assets") in one or more lots pursuant to that certain Asset Purchase Agreement, dated as of December 9, 2019 (together with the schedules thereto and related documents, and as may be amended, supplemented or otherwise modified from time to time, the "Stalking Horse Agreement"), substantially in the form attached hereto as **Exhibit B**, by and among the Debtor and DTF Holdings, LLC (the "Buyer" or "Stalking Horse Bidder"), which are presently encumbered by liens securing the Debtor's obligations under certain DIP financing from Toyota Motor Credit Corp. ("TMCC" or the "DIP Lender") approved by this Court on October 31, 2019, as well as other pre-petition loan facilities described below, between the Debtor and TMCC, (B) approving bidding procedures and protections in connection therewith; (C) approving procedures for the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases (the "Assumption  and Assignment Procedures") and approving the form and manner of notice thereof (substantially in the form attached hereto as **Exhibit C**, the "Cure Notice"); and (D) approving the form and manner of notice (the "Sale Procedures Notice"), a copy which is attached to the proposed Sale Procedure Order as Exhibit 1, pursuant to Federal Rule of Bankruptcy Procedure 2002; (II) a second Order (the "Sale Order"[1]) approving (A) the sale of the Purchased Assets to the holder or holders of the highest or otherwise best bid for the Purchased Assets, free and clear of any and all liens, claims, encumbrances and other interests (with such liens, claims and encumbrances to attach to the proceeds of such sale); and (B) the assumption and assignment of certain contracts (the "Assumed Contracts"). In support of its Sale Motion, the Debtor respectfully represents as follows:

---

[1] A copy of the Sale Order will be provided to interested parties prior to the hearing at which the Debtor will seek approval of the sale of the Assets

## PRELIMINARY STATEMENT

1.      The Sale Motion should be granted because the orderly liquidation of the Debtor

is the sole means of providing any possibility that the Debtor's secured, priority and general

unsecured creditors will receive a distribution in these cases and provides an opportunity to

preserve the hundreds of jobs held by the Debtor's employees. The procedures outlined below

provide the greatest opportunity to achieve these objectives.

## BACKGROUND

2.      On October 27, 2019 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code, commencing the Chapter 11 Case in the

United States Bankruptcy Court for the District of New Jersey.

3.      The Debtor is operating its business and managing its property as debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the filing of this

Application, no request has been made for the appointment of a trustee or examiner and no

statutory committee has been appointed in the Chapter 11 Case.

4.      The Debtor owns and operates an automotive dealership known as Lexus of

Englewood and located at: (1) 53-59 Engle St., Englewood, NJ 07631, (2) 75 Columbus Avenue,

Englewood, New Jersey 07631, (3) 335 Grand Avenue, Leonia, New Jersey 07605, (4) 40

Rockwood Place, Englewood, New Jersey 07631, and (5) 136 Engle Street, Englewood, New

Jersey 07631 (the "Dealership").

5.      The Debtor sells, services and provides (i) new and used motor vehicle products it

purchases from Toyota Motor North America ("TMNA"), (ii) other used motor vehicle products,

and (iii) new motor vehicle parts and accessories purchased from TMNA or affiliates.  The

Debtor also owns, leases or licenses all tangible and intangible assets used in conjunction with the Dealership.

6.      The Debtor, formed in November 2016, began operating the Dealership as of July 13, 2017.

7.      On or about August 17, 2017, the Debtor executed and delivered to TMCC an Inventory Loan and Security Agreement, and Capital Loan and Security Agreement, as amended from time to time (collectively, the "TMCC Loan Documents").  The members of Debtor, and Leonard Automotive Enterprises, Inc., also executed and delivered their personal guarantees of payment in connection with the TMCC Loan Documents.

8.      Pursuant to the TMCC Loan Documents, the Debtor granted a security interest to TMCC in the following assets:

> all of the following property of Borrower, whether now owned, on order, in transit, or hereafter acquired or created (i) inventory, including new and used Motor Vehicles, including all parts, accessories, furnishings and supplies, and inventory property of like kind or type including replacements, substitutions, additions and returns, and further including all consigned goods; (ii) equipment, including all new and used furniture, equipment, appliances, fixtures, machinery, tools and supplies and good of like kind or type, including all additions, substitutions, replacements, attachments and accessories; (iii) investment properties; (iv) accounts; (v) deposit accounts, including the Operating Account (as defined in this Agreement), and all monies on deposit therein; (vi) cash money or other personal property assets that now or hereafter come into the possession, custody, or control of TMCC, including payments and credits that TMCC may owe to such Borrower that TMCC may have or retain in its possession, whether in the form of cash collateral, reserve contingency or escrow accounts or otherwise; (vii) chattel paper (including electronic chattel paper), instruments, documents, security agreements, contract rights, policies, certificates of insurance, advance warranty payments, including any guaranties thereof and choses or things in action; (viii) such Borrower's general intangibles (including tax refunds, license rights, franchise rights, copyrights, patent rights, trademarks, service marks, trade names and goodwill, files, computer disks and tapes, computer programs and software, catalogs, purchase orders and customer lists, all rights to receive payment, credits and other compensation including all holdbacks, incentive payments, rebates, stock rebates, refunds, allowances, and additional 'factory credits' from any manufacturer, distributor of supplier of inventory or equipment,

or from any of their subsidiaries or affiliates), supporting obligations, URLs and domain names; (ix) Negotiable Collateral; (x) all proceeds of the foregoing or any portion thereof, including proceeds of proceeds, goods received in trade, claims and cost recoveries, insurance proceeds, refunds of insurance premiums, proceeds derived from such Borrower's sale or assignment of chattel paper and all cash and other funds held in all deposit account in which proceeds may be deposited; and (xi) Borrowers' Books. The types of Collaterals described above are intended to change, expand and contract as the definitions and descriptions of such types of Collateral that are set forth in the Uniform Commercial Code change, expand and contract.

(the "TMCC Collateral")

9.      As of the Petition Date, TMCC alleges the current balance owed under the

prepetition loan is approximately $60,676.319.69.

10.      TMCC holds a first priority lien on and security interest in the TMCC Collateral,

which secures TMCC's claims, pursuant to and in accordance with the TMCC Loan Documents,

by virtue of the filing and recording of a UCC-1 with the New Jersey Department of the Treasury

on July 18, 2017 and that its lien in the TMCC Collateral is duly perfected, valid, existing, and

legally enforceable.

11.      As a result of litigation commenced by TMCC against, *inter alia*, the Debtor on

October 18, 2019, the Dealership was operating under a temporary restraining order issued by

Judge Claire C. Cecchi in *Toyota Motor Credit Corporation v. CTE 1 LLC, Leonard Automotive*

*Enterprises, Inc., Carmine A. DeMaio III, Frank C. Holtham Jr. and Carmine Zeccardi Jr.*,

United States District Court for the District of New Jersey, Civil Action No. 2:19-cv-19092-

CCC-ESK ("TRO").

12.      In October 2019 the Debtor began soliciting offers for the Dealership. As a result

of these efforts the Debtor had received at least ten indications of interest from possible

purchasers at the time it filed its bankruptcy case.

13.    Because of the Debtor's inability to satisfy expenses subsequent to the Petition Date, the Debtor entered into debtor-in-possession financing (the "DIP Financing Facility") with TMCC, which was approved by this Court on October 31, 2019.  The DIP Financing Facility has a maturity date of December 15, 2019.

14.    In connection with this bankruptcy filing, the Debtor's operating manager, Carmine DeMaio III, decided to retained Carl Marks Advisory Group ("CMAG") to both assist in the Debtor's operations and in the solicitation of interested parties to purchase the Purchased Assets, and to employ Steven Agran of CMAG as Chief Restructuring Officer ("CRO"). Carmine DeMaio III ceded all management control at the end of business on October 29, 2019 to Mr. Agran at the time of his appointment as CRO.  Mr. Agran was the CRO for the BICOM bankruptcy proceedings involving Jaguar Land Rover of Manhattan, Maserati of Manhattan and Bay Ridge Ford dealerships, and has over 25 years of turnaround and interim management experience.  This Court approved the engagement and retention of CMAG, and the employment of Mr. Agran as CRO, on October 31, 2019.

15.    After his appointment, the CRO reached out to 650 Dealers, including 500 in the Northeast, every Lexus dealer in the Eastern Region (62 Dealers) and the Top 150 national dealerships about making offers for the Dealership.  CMAG provided interested parties with access to a "virtual data room" with information required by a prospective purchaser to make an informed decision regarding the Debtor's assets.  Multiple bids were made for the Debtor's assets, and the Debtor selected the Stalking Horse Bidder to act as the stalking horse.

16.    Based upon the CRO's experience, the Debtor believes the marketing process that it started in October will culminate in a successful sale of the Dealership for the highest amount that is possible.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

17.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and

1334, and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United

States District Court for the District of New Jersey, entered on July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  Venue is proper in this district pursuant to 28 U.S.C. §§

1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

18.     The statutory predicates for the relief sought herein are set forth in rule 2002 of

the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

19.     By this Sale Motion, the Debtor first requests the entry of the Sale Procedures

Order, which shall approve the Bid Procedures Notice and bidding procedures and protections in

connection therewith to sell the Purchased Assets at an auction as described below within that

time period, and also approve the Assumption and Assignment Procedures and the Cure Notice.

20.     Second, at the Sale Hearing, the Debtor will seek entry of the Sale Order, (a)

authorizing and approving the Sale of the Purchased Assets free and clear of Liens, Claims and

other Liabilities (each as defined in the Stalking Horse Agreement), except as provided by the

Stalking Horse Agreement or a Proposed Asset Purchase Agreement (as defined herein), (b)

authorizing and approving the assumption and assignment of certain of the Debtor's Executory

Contracts and Unexpired Leases related thereto.

21.     By reason of the foregoing, the Debtor is confident that the sale process will

achieve a disposition of the Purchased Assets at fair and reasonable prices, and, therefore, is

supported by the exercise of the Debtor's sound business judgment. The Debtor believes that the

sale of the Purchased Assets and procedures proposed hereby in connection therewith (which

establish several procedural and substantive safeguards), will achieve the highest or best price for

the Purchased Assets and are therefore in the best interests of all interested parties.

## STATUTORY AUTHORITY FOR RELIEF SOUGHT

22.    The Debtor believes that the sale of the Purchased Assets proposed in this Sale

Motion will produce the highest or best price for the Purchased Assets and is in the best interests

of the estate.

23.    Ample authority exists for the approval of the proposed sale on the terms and

conditions set forth in the Sale Motion, Section 363(b)(1) of the Bankruptcy Code, which

authorizes a debtor to sell assets of the estate other than in the ordinary course of business free

and clear of liens, claims and encumbrances, and which provides, in relevant part, as follows:

"The [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the

ordinary course of business, property of the estate." 1 I U.S.C. § 363(b)(1).

24.    With respect to a motion for authority to sell substantially all assets of a Chapter

11 debtor, bankruptcy courts may approve such requests where there is a valid business reason for

doing so. *See In re Lionel*, 722 F.2d 1063, 1066 (2d Cir. 1983) ("*Lionel*") (a "sound business

purpose must be established to warrant a sale of assets outside of a Chapter 11 plan"). It is well-

established that a section 363 sale is an appropriate means to effectuate a liquidation in a Chapter

11 case. *See In re Chrysler LLC*, 405 B.R. 84, 96 (Bankr. S.D.N.Y.), *aff'd,* 576 F.3d 108 (2d Cir.

2009), *cert. granted, judgment vacated sub nom. Indiana State Police Pension Trust v. Chrysler

LLC*, 558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009), and *vacated sub nom. In re

Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010) (citing *Florida Dep't of Revenue v. Piccadilly

Cafeterias, Inc.*, 554 U.S. 33, 37, note 2 (2008)); *In re GSC, Inc.*, 453 B.R. 132, 155–56 (Bankr.

S.D.N.Y. 2011) (citing *In re Gen. Motors Corp.,* 407 B.R. 463, 488 (Bankr.S.D.N.Y.2009)).

8

25.     Most courts that have publicly confronted the issue appear to view the "business

judgment" test as a relatively low hurdle to clear and have viewed a finding of perishing or

depreciating value as relevant but not mandatory. *See In re Chateaugay Corp.* 973 F.2d 141, 144

(2d Cir. 1992) (approving section 363 sale where evidence showed that assets were

depreciating); *Stephens Indus. Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (affirming sale

to prevent loss of FCC licenses)*; In re Equity Mgmt. Sys*, 149 B.R. 120, 124 (Bankr. S.D. Iowa

1993) (allowing a prompt sale of assets to avoid missing good business opportunity); *In re Naron*

*& Wagner, Chartered,* 88 B.R. 85, 87-88 (Bankr. D. Md. 1988) (approving sale where proceeds

would exceed liquidation value).

26.     When applying the business judgment test, several courts have noted the existence

of a "presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company." *See In re Global Crossing Ltd*., 295 B.R. 726,742-44 (Bankr. S.D.N.Y

2003); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.,* 147 B.R.

650 (S.D.N.Y 1992) *aff'd* 135 B.R. 746 (Bankr. S.D.N.Y 1992); *CRTF Corn v. Federated Dep't*

*Stores*, 683 F. Supp. 422 (S.D.N.Y. 1988) (courts "will uphold the board's decisions [to sell all

assets] as long as they are attributable to any rational business purpose.").

27.     Courts have also required a debtor to establish the following additional elements

to sell property outside the ordinary course of business: (i) adequate and reasonable notice has

been provided to interested parties;[2] (ii) the sale price is a fair and reasonable price;[3] and (iii) the

sale was negotiated in good faith.[4]

---

[2] 11 U.S.C. § 363(b).

[3] *In re Lounds*, 1998 U.S. Dist. LEXIS 10925 (W.D. Mich. 1998); *Stephens Indus*., 789 F.2d at 389-90 (quoting and adopting as persuasive the reasoning of *In re Lionel).*

[4] *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143, 149-50 (3rd Cir. 1986).

28.     In addition, the Debtor seeks to sell, under Section 363(f) of the Bankruptcy

Code, the Purchased Assets free and clear of lines claims and encumbrances, with such liens,

claims and encumbrances attaching to the proceeds of sale of the Purchased Assets to the same

extent, validity and priority that existed as of the Petition Date.

29.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property, under

section 363(b) or (c), free and clear of any interest in such property of an entity other than the

estate. *See* 11 U.S.C. § 363(f). However, a sale free and clear of liens may be approved only if at

least one of the following five conditions are met: (1) applicable non-bankruptcy law permits

sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a

lien and the price at which such property is to be sold is greater than the aggregate value of all

liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be

compelled to accept a monetary satisfaction of such interest. *Id.*

30.     In the present case, TMCC consents to the sale procedure set forth below. As a

result, the Purchased Assets may be sold free and clear of TMCC's liens, with the liens to attach

to the proceeds of the sale. Furthermore, as set forth below, the Purchased Assets sale

contemplated by the Sale Motion satisfies the *Lionel* factors and should be approved.

## THE SALE PROCEDURES

31.     The Debtor proposes that the Stalking Horse Agreement serve as the form asset

purchase agreement to be provided to all prospective bidders (each, a "Potential Bidder") that

wish to participate in the Bidding Process (as defined below) for the Purchased Assets. Among

other requirements, each Potential Bidder for the Purchased Assets will be required to submit an

executed copy of a Proposed Asset Purchase Agreement (as defined below) to the Debtor

reflecting the terms upon which the Potential Bidder would agree to purchase the Purchased

Assets and assume certain liabilities.

## A.      The Bid Protections

32.      Pursuant to the Stalking Horse Agreement, the Debtor has agreed, subject to

Bankruptcy Court approval, to provide the Stalking Horse Bidder with certain Bid Protections,

consisting of an expense reimbursement of $250,000.00 as more fully described in the Stalking

Horse Agreement (as defined therein, the "Expense Reimbursement").  In addition, the Debtor

has agreed that in the Bidding Process the next highest qualified bid after the bid of the Stalking

Horse Bidder must contain total consideration equivalent to an amount of at least $500,000.00

($250,000.00 plus the Expense Reimbursement) in excess of the bid of the Stalking Horse Bidder

(together with the Expense Reimbursement, the "Bid Protections").

33.      The Stalking Horse Agreement including, but not limited to the Bid Protections,

was heavily negotiated between the Debtor and the Stalking Horse Bidder. The Bid Protections

are integral to the Stalking Horse Agreement because they will secure the highest or otherwise

best offer available to the Debtor and its estate for the Purchased Assets. The Bid Protections

were heavily negotiated and are an essential condition of the Stalking Horse Bidder for its entry

into the Stalking Horse Agreement and agreeing to act as the Stalking Horse Bidder.

## B.      The Bidding

34.      The Debtor requests that the Court authorize the Debtor, in accordance with the

procedures described below, to solicit bids for the Purchased Assets.  The Bid Procedures

describe, among other things, the procedures for interested parties to access due diligence, the

manner in which Potential Bidders and bids become "qualified," the procedures for receipt and

negotiation of bids received, the conduct of any auction, the selection and approval of the

ultimately successful bidder, and related deadlines (collectively, the "Bidding Process"). The

Debtor believes that the Bidding Process will afford the Debtor the best opportunity to continue

to pursue the prepetition sale process and enable it to maximize value for the benefit of its estate

and creditors.

35.     The Debtor will hold a sale at which any bidder whose bid is deemed to meet all the

requirements of the bid requirements, may participate. All qualified bidders will then be invited to

an auction for the sale of the Purchased Assets.

36.     If there are other bids by a qualified bidder at the auction, the Debtor, in

consultation with TMCC and with the Official Committee of Unsecured Creditors (the

"Committee"), will determine in its reasonable discretion the highest and best bid, or bids, for the

Purchased Assets. Such highest and best bid will be submitted to the Court for approval at the

sale hearing to approve the sale or other disposition of the Purchased Assets as set forth in the

proposed Sale Order.

37.     The Debtor will rely on the experience of its CRO, and CMAG, to notify all

parties-in-interest of the proposed sale of the Purchased Assets.  In addition, the Debtor will

undertake a robust marketing effort during this period. Initially, CMAG will transmit a notice of

the sale of the Purchased Assets to six hundred fifty dealerships: a) the top one hundred fifty

dealerships, by volume, in the United States; and b) the top five hundred dealers by volume in

the Mid-Atlantic states.

38.     At the same time, CMAG will be providing interested parties with access to a

"virtual data room" that will provide them with information required by a prospective purchaser

to make an informed decision regarding the Debtor's assets. Finally, the Debtor shall advertise in

trade publications that will provide the greatest exposure to purchasers of the pending sale. As a

result of these efforts, the Debtor believes that the proposed schedule provides prospective

bidders enough time to conduct due diligence and prepare their highest or best bids, while

facilitating the expeditious sale of the Purchased Assets.

39.    When making a bid for the Purchased Assets, all bidders must abide by the

bidding requirements and the auction procedures, as shall be set forth in the Sale Procedures

Notice and as set forth below.

**A.    Diligence by Prospective Bidders**

40.    By no later than December 18, 2019, the Debtor shall serve the Sale Procedures

Notice upon prospective bidders. The Debtor shall promptly notify TMCC of the identity of all

entities to which the Debtor has sent the Sale Notice. Additionally, TMCC shall be entitled to

deliver the Sale Notice to other entities, provided that TMCC shall promptly notify the Debtor of

the identity of all entities to which Chase has sent the Sale Notice.

41.    The Debtor shall allow any such prospective bidder(s) to conduct reasonable due

diligence, including reasonable access to its books and records, in connection with the

consideration of a potential bid for the Purchased Assets. In connection with the conduct of due

diligence, the Debtor may require a prospective purchaser to: (a) demonstrate the financial ability

to purchase such portion of the Purchased Assets that such bidder seeks to acquire, as determined

by the Debtor in its reasonable discretion; and (b) execute a confidentiality agreement in a form

reasonably acceptable to the Debtor.  The Debtor will use good faith efforts to provide to the

Stalking Horse Bidder access to written information made available to any Qualified Bidder if

not previously made available to the Stalking Horse Bidder.

**B.    Bid Requirements**

42.    The proposed Sale Procedures Notice further provides that any person or entity

that is interested in purchasing all or a portion of the Purchased Assets must submit to the Debtor

a bid in conformance with the following provisions by not later than January 2, 2020 at 4:00 p.m.

(EST).

Sale Process:

A.    The Debtor shall market for sale all or substantially all of its assets in appropriate lots and aggregated lots (excluding Debtor's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions")) and may include combined lots constituting all or substantially all of the Debtor's assets other than Avoidance Actions.

B.    The Debtor shall provide appropriate information to interested potential Bidders that enter into a non-disclosure agreement with the Debtor. The Debtor shall endeavor to provide consistent information to potential Bidders through the use of a "data room" or other document depository so that potential Bidders for the same Purchased Assets have access to the same information.

C.    The deadline for submitting bids on the Purchased Assets consistent with the Bidding Requirements set forth below **is January 2, 2020 at 4:00 p.m. Eastern Standard Time** (the "Bid Date"). All bids and the associated bid materials set forth in the Bidding Requirements below must be received by Steven Agran, Chief Restructuring Officer of the Debtor (the "CRO"), at 900 Third Avenue, 33rd Floor, New York, NY 10022, Attn: Steven Agran, email: sagran@carlmarks.com by the Bid Deadline.

D.    In the event multiple Qualified Bids (as defined below) for the Purchased Assets are received by the Debtor, the Debtor will conduct an auction for the Purchased Assets on **January 6, 2020 commencing at 12:00 noon Eastern Standard Time** (the "Auction") at the offices of Debtor's counsel, Arent Fox, 1301 Avenue of the Americas, 42nd Floor, New York NY 10019, or such other location designated by the Debtor prior to the scheduled auction (i) in a filing on the docket and (ii) by written notice to the entities entitled to attend the Auction as set forth in Auction and Sale Process C(ii) below.

E.    Upon the Debtor's selection of one or more Successful Bids (as defined below) and Back-Up Bids (as defined below) for the Purchased Assets, the

Debtor shall seek authorization from this Court to sell the subject assets and assume and assign the subject executory contracts to the Successful Bidder(s) (as defined below) and/or Back-Up Bidder(s) (as defined below) in a sale hearing on **January 9, 2020, at _____AM/PM Eastern Standard Time** (the "<u>Sale Hearing</u>") in the courtroom of the Honorable Vincent F. Papalia, United States Bankruptcy Judge, District of New Jersey, 50 Walnut Street, Newark, New Jersey.

F.    The Debtor shall use best efforts to close each sale on or before **February 29, 2020**.

<u>Bidding Requirements</u>:

A.    Each bid for all or a portion of the Purchased Assets must be unconditional and not contingent upon any event other than (i) approval by this Bankruptcy Court and (ii) approval by the manufacturer/franchisor Lexus, a Division of Toyota Motor Sales, USA, Inc. (the "<u>Manufacturer</u>") with respect to the Purchased Assets to be acquired.  Each bid expressly may not be subject to, including without limitation, any contingencies related to diligence, environmental matters, leases, financing or subsequent approval by any entity, person, shareholder, member, manager or board.

B.    The Debtor and the Manufacturer reserve their rights under the Dealer Sales and Service Agreement ("<u>DSSA</u>"). In particular, the Manufacturer reserves its rights with respect to any proposed assumption of the DSSA, including, without limitation, its rights to consent or not consent to the assumption and assignment of the DSSA or franchise (provided that consent may not be unreasonably withheld or delayed). The Manufacturer has the right to disqualify any bidder prior to the auction but would need to provide acceptable reason for the disqualification. The Debtor reserves its rights to object or otherwise challenge the Manufacturer's actions or inactions. To facilitate the exercise of such rights, each Bidder seeking to acquire the franchise rights from the Debtor shall provide the (x) CRO at 900 Third Avenue, 33rd Floor, New York, NY 10022, Attn: Steven Agran, email:  <u>sagran@carlmarks.com,</u>  and (y) the Manufacturer, with the following items on or before **December 27, 2019**:

(i)    The names of each direct and indirect owner of the proposed Bidder together with whatever other information is reasonably needed by the Manufacturer to conduct a background check of each such owner and written authorization of such owner for the Manufacturer to conduct the background check.  A bid must also fully disclose any connections, relationships (business or otherwise), whether or not known, to the Debtor or agreements or understandings with the Debtor, the Stalking Horse Bidder or any other known bidders,

15

Potential Bidder or Qualified Bidder, and/or any officer, manager, or member of the Debtor; and

(ii)    The CSI Reports for the current year to date and the two preceding calendar years, which include comparator scores (i.e., nation, district and/or region) provided by the relevant vehicle manufacturers for whose vehicles Bidder is a dealer. The CSI Reports must be submitted for all franchises owned (in whole or in part) or operated by the proposed Bidder, and/or any direct owner of the proposed Bidder and/or any indirect owner of the proposed Bidder. However, for any proposed Bidder or owner thereof that is an existing dealer for the Manufacturer, such owner does not have to supply CSI Reports to the Manufacturer.

C.    Bids must be received by the Debtor no later than the Bid Date and contain the following:

(i)    Current audited financial statements of (a) the Bidder, or (b) if the Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holders of the Bidder who shall either guarantee the obligations of the Bidder or provide such other form of financial disclosure acceptable to the Debtor in the exercise of its reasonable business judgment.

(ii)    Written evidence of the Bidder's (a) financial capacity to close the contemplated transaction, and (b) provide adequate assurance of future performance under any executory contracts or unexpired leases to be assumed and/or assigned pursuant to the proposed transaction.

(iii)    A completed franchise application for the Manufacturer. Each Bidder shall concurrently provide such application to the Manufacturers.

(iv)    A statement that the Bidder offers to purchase, in cash, some or all of the Purchased Assets upon terms and conditions that the Debtor reasonably determines are at least as favorable to the Debtor as those terms and conditions set forth in the Stalking Horse Agreement (or pursuant to an alternative structure that the Debtor reasonably determines is no less favorable to the Debtor than the terms and conditions of the Stalking Horse Agreement). For the avoidance of doubt, any Qualified Bid must, either on its own or when considered together with other Qualified Bid(s), provide value in excess of the Stalking Horse Agreement plus the Expense Reimbursement and minimum overbid requirements detailed below in Section (ix).

16

(v)     A commitment to close the transactions within the timeframe contemplated by the Stalking Horse Agreement.

(vi)    A binding and enforceable signed writing that the Bidder's offer is irrevocable unless and until the Debtor accepts a higher or otherwise better bid and such Bidder is not selected as a Back-Up Bidder; provided that if such Bidder is selected as the Successful Bidder, its offer shall remain irrevocable until four (4) months after the execution of the applicable Proposed Asset Purchase Agreement. Such writing shall guarantee performance of the Bidder by its parent entities, if any, or provide such other guarantee of performance requested by and acceptable to the Debtor.

(vii)   A duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement (collectively, the "Proposed Asset Purchase Agreement"); provided, however, that such Proposed Asset Purchase Agreement shall not include any financing or diligence conditions, or any other conditions that are less favorable to the Debtor than the conditions in the Stalking Horse Agreement). The Automobile Asset list must include a formula for valuing prior year models, Demo and Loaner Units, as well as, parts (both Lexus and non-manufacturer) value.  Each Proposed Asset Purchase Agreement shall be required to provide for the assumption and assignment of the DSSA.

(viii)  A cash deposit equal to five percent (5%) of the cash consideration of such Bidder's bid (the "Deposit"), not to exceed $1,250,000, in the form of a wire transfer to the Debtor or a cashier's check payable to the Debtor and to be held in an escrow account at Arent Fox, LLP pending completion of the Sale unless, as set forth herein, the Bidder is determined to be the Prevailing Bidder or a Back-Up Bidder (each as hereafter defined).

(ix)    A cash purchase price that exceeds the aggregate cash consideration to be paid to or for the benefit of the Debtor's estate set forth in the Stalking Horse Agreement by at least $500,000.00, which represents the sum of: (i) the Expense Reimbursement of $250,000.00, plus (ii) an overbid of $250,000.00, and otherwise has a value to the Debtor, in the exercise of its reasonable business judgment, subject to consultation with the DIP Lender, Toyota Motor Credit Corporation (the "DIP Lender") and with the Official Committee of Unsecured Creditors (the "Committee"), that is greater or otherwise better than the value offered under the

Stalking Horse Agreement (including taking into account the impact of any liabilities assumed in the Stalking Horse Agreement).

(x)   Identification with particularity of which executory contracts and unexpired leases the Bidder wishes to assume and provides details of the Bidder's proposal for the treatment of related Cure Costs (as defined in the Sale Procedures Order), and contains sufficient information concerning the Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned.

(xi)   An express acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding acquiring the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Proposed Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, Expense Reimbursement, termination fee, or similar type of payment in connection with its bid.

(xii)   An irrevocable undertaking by the Bidder to execute and deliver to the Debtor such other guarantee of performance or assurance acceptable to the Debtor in its discretion.

(xiii)   A statement that the Bidder consents to the jurisdiction of the Bankruptcy Court, as applicable.

(xiv)   Written confirmation that the Bidder has not engaged in any collusion with respect to the bidding or the sale process.

D.   Only bids meeting the above requirements as determined by the Debtor will be considered and, of those, only those which the CRO believes, in the exercise of his reasonable business judgment, subject to consultation with the DIP Lender and with the Committee, would be consummated if selected as the Successful Bid, shall be considered "Qualified Bids." Each Bidder that is determined to have submitted a Qualified Bid will be considered a "Qualified Bidder."

E.   Notwithstanding anything in the Bidding Procedures to the contrary, the Stalking Horse Bidder is deemed to be a Qualified Bidder with respect to

the Purchased Assets and the Stalking Horse Bid is deemed to be a Qualified Bid for all purposes in connection with the Bidding Procedures, the Auction, and the Sale, and the Stalking Horse Bidder shall not be required to take any further action in order to attend and participate in the Auction (if any) or, if the Stalking Horse Bidder is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.

Auction and Sale Process:

A.      Irrevocable Offer and Jurisdiction. Each Qualified Bid submitted shall constitute an irrevocable offer and be binding on the applicable Qualified Bidder from the time the bid is submitted until the entry of the Sale Order (as defined below). All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of any documents governing, effectuating, or relating to the contemplated sale transaction(s).

B.      Auction Time and Location. As set forth in Sale Process 2.D. above, in the event the Debtor receive one or more Qualified Bids for the same Purchased Assets, the Debtor shall hold an Auction.

C.      Auction Procedures. The Auction shall be conducted in accordance with the following procedures:

   (i)      Prior to the commencement of the Auction, the Debtor shall provide notice to each Qualified Bidder of the Qualified Bid that the Debtor believes, in the exercise of its reasonable business judgment in consultation with the DIP Lender and with the Committee, is the highest or otherwise best offer for the applicable Purchased Assets (the "Starting Bid").  The Debtor will value each bid based on the Proposed Asset Purchase Agreements and will determine bid order based upon the value of the bids.

   (ii)     Only the Debtor, the DIP Lender, representatives of the Creditors Committee, representatives of the Manufacturer, and each Qualified Bidder, and each of their respective advisors and representatives, may attend the Auction in person, and only Qualified Bidders physically present at the Auction will be entitled to make any Subsequent Bids (as defined below) at the Auction.

   (iii)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Purchased Assets with any other Qualified Bidder, potential Bidder, the Manufacturer, or any other person or entity and shall be required to reaffirm that it has not engaged in any such collusion with each Subsequent Bid that it makes.

(iv)    All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v)    The CRO, on behalf of the Debtor, in consultation with the DIP Lender and with the Committee, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (1) are not inconsistent with this Order, the Bankruptcy Code, or any other order of this Court, and (2) are disclosed to each Qualified Bidder at the Auction.

(vi)    Bidding at the Auction for each lot or relevant combinations of lots will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid by a Qualified Bidder (a) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (b) is determined by the CRO, on behalf of the Debtor, in consultation with the DIP Lender and with the Committee, to be (1) for the first round, a higher or otherwise better offer than the Starting Bid, and (2) for subsequent rounds, a higher or otherwise better offer than the then Leading Bid (as defined below).

(vii)    Each Subsequent Bid at the Auction shall provide net value to the estate of at least $250,000 over the Starting Bid or the Leading Bid, as applicable, which net value may be in the form of cash or non-cash consideration (with any such non-cash consideration to be valued by the CRO, on behalf of the Debtor, in consultation with the DIP Lender and with the Committee and articulated on the record of the Auction). The CRO, on behalf of the Debtor, may set lower incremental bids as he determines, in the exercise of his reasonable business judgment, by notifying each Qualified Bidder for such lot or combination of lots of such reduced bid increment.

(viii)    A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(ix)    After each round of bidding, the CRO, on behalf of the Debtor, shall announce the bid that he believes in the exercise of his reasonable business judgment, subject to consultation with the DIP Lender and with the Committee, to be the highest or otherwise best offer (the "Leading Bid").

(x)    All Qualified Bidders for a particular lot will be entitled to be present for all Subsequent Bids for such lot at the Auction, provided that all Qualified Bidders wishing to attend the Auction must have at

least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(xi)  The Debtor reserves the right, in its reasonable business judgment, to make one or more adjournments of the Auction to, among other things: (1) facilitate discussions between the Debtor and Qualified Bidders; (2) allow individual Qualified Bidders to determine how they wish to proceed; (3) consider and determine the current highest or otherwise best Subsequent Bid at any given time during the Auction; and (4) give Qualified Bidders the opportunity to provide the Debtor and the DIP Lender with such additional evidence as the Debtor request that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Subsequent Bid amount.

D.  <u>Valuation of Bids</u>. Qualified Bids (including Subsequent Bids) will be valued by the CRO, on behalf of the Debtor, based upon factors such as: (i) the terms, economic or otherwise, of the transaction documents submitted as part of a Qualified Bid; (ii) the total expected value of the Qualified Bid to the Debtor's estate; (iii) whether the Qualified Bid is for some or all of the Debtor's assets and the value of any assets not contemplated to be acquired as part of such Qualified Bid; (iv) the impact of any rejection damages claims arising from the proposed rejection of contracts or unexpired leases under the Qualified Bid; (v) the extent to which the identity of the Qualified Bidder or any modifications to the form of the Stalking Horse Agreement by such Qualified Bidder are likely to affect the timing of execution of definitive transaction documents or affect the timing of the closing of a transaction, and the cost or benefit to the Debtor of such modifications or timing considerations; (vi) any conditions to the Qualified Bidder's obligations to close a transaction, including the likelihood that the  Manufacturer will consent to the Qualified Bidder becoming a franchisee of the Manufacturer, and the timing thereof (including the time required to obtain any necessary approvals); the ability to obtain all necessary antitrust, governmental, foreign investment or other regulatory approvals for the proposed transaction; and any other factors the CRO may deem relevant, on behalf of the Debtor, in his reasonable business judgment and in consultation with the DIP Lender and the Committee.

E.  <u>Successful Bid</u>. Immediately upon the conclusion of the Auction, the CRO, on behalf of the Debtor, in consultation with the DIP Lender and the Committee, shall (i) determine, consistent with this Order, which bid or bids collectively constitute the highest or otherwise best bid for the Purchased Assets in one or more lots (such bid or bids collectively the "<u>Successful Bid</u>" and the Bidder or Bidders collectively submitting the Successful Bid, the "<u>Successful Bidder</u>") and (ii) communicate to the

Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The Debtor shall be deemed to have accepted a Qualified Bid only when

(i) either (1) such bid is declared the Successful Bid at the end of the Auction or (2) such bid is declared a Back-Up Bid (as defined below) and the Debtor elect to consummate the sale transaction(s) contemplated by such Back-Up Bid with the Back-Up Bidder pursuant to the terms hereof;

(ii) definitive documentation has been executed in respect thereof; and (iii) the Court has entered an order approving the sale transaction(s) contemplated thereby. The Successful Bidder must increase its deposit to ten percent (10%) of the cash consideration of its bid no later than three days after the Sale Hearing.

F.     Back-Up Bid.

(i)     Immediately following the selection of the Successful Bid, the CRO, on behalf of the Debtor, in consultation with the DIP Lender and with the Committee, shall (i) determine which bid or bids collectively constitute the second highest or otherwise best bid and, if applicable, third highest or otherwise best bid and may, in his discretion and in consultation with the DIP Lender and with the Committee, deem such second and third highest or otherwise best bid or bids each a back-up bid (such bid or bids shall each be a "Back-Up Bid" and each Bidder submitting a Back-Up Bid, a "Back-Up Bidder") and (ii) communicate to the Qualified Bidders the identity of each Back-Up Bidder and the details of each Back-Up Bid.

(ii)    Each Back-Up Bid shall remain open and shall be irrevocable and binding on the Back-Up Bidder until the earlier of (i) the first business day following the consummation of the sale of the Purchased Assets that are the subject of such Back-Up Bid to the Successful Bidder or a higher or better Back-Up Bidder, and (ii) 11:59 p.m. Eastern time on the day ninety (90) days after the date the Sale Order is entered by the Court. If the Successful Bid, or the next highest or otherwise best Back-Up Bid is terminated or fails to close within the time period specified in the Successful Bid or such Back-Up Bid, the CRO, on behalf of the Debtor, shall, in consultation with the DIP Lender and with the Committee, be authorized to consummate the sale transaction(s) contemplated by the next highest or otherwise best Back-Up Bid with such Back-Up Bidder without further order of the Court.

(iii)   The Back-Up Bidder must increase its deposit to ten percent (10%) of the cash consideration of its bid no later than three days after the Sale Hearing.

G.    <u>As Is Where Is</u>. Any sale of Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or its estates, except to the extent expressly set forth in the purchase agreement corresponding to the Successful Bid or applicable Back-Up Bid, as the case may be. Each Qualified Bidder shall be deemed to acknowledge and represent that it had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Qualified Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied or by operation of law or otherwise regarding the Purchased Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in their asset purchase agreement.

H.    <u>Free and Clear</u>. Except as otherwise provided in the terms of the asset purchase agreement for Successful Bid or such Back-Up Bid which may ultimately be consummated, all of the Debtor's right, title and interest in and to the Purchased Assets subject to such sale shall be sold free and clear of all liens, claims (as such term is defined in section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, and all rights to object or consent to the effectiveness of the transfer of the Purchased Assets, all as more specifically set forth in the Sale Motion and the proposed order approving the sale transaction(s) (the "<u>Claims</u>"), and as set forth in the Sale Order, such Claims to attach to the proceeds of the sale with the same validity and priority as such Claims applied against the applicable Purchased Assets.

I.    <u>Return of Deposit</u>. The deposit submitted by each Qualified Bidder shall be returned promptly following the Sale Hearing unless such Qualified Bidder is selected as a Successful Bidder or a Back-Up Bidder. A deposit submitted by a Back-Up Bidder will be held by the Debtor until forty-eight (48) hours after the Back-Up Bid has been terminated in accordance with this Order and the Asset Purchase Agreement entered into with such Back-Up Bidder. If a Successful Bidder or a Back-Up Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder or Back-Up Bidder, as applicable, the Debtor shall be entitled to retain the deposit (and such deposit shall constitute Cash Collateral of the DIP Lender) in partial satisfaction of any damages resulting from the breach or failure to perform by such Successful Bidder or Back-Up Bidder, without prejudice to any other rights the Debtor may have. The Debtor shall credit the Deposit of the

Successful Bidder or the Back-Up Bidder, as applicable, toward the purchase price for their transaction on the closing of the sale to them of the Purchased Assets they are acquiring.

J.      Reservation of Rights. Except as otherwise provided in this Order, the Debtor reserves the right, in the exercise of the CRO's reasonable business judgment on behalf of the Debtor's estate, in consultation with the DIP Lender and with the Committee, to: (i) determine which Bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iv) designate the second and third highest or otherwise best bids as Back-Up Bids; (v) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of this Order or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its estate; (vi) waive terms and conditions set forth herein with respect to all Qualified Bids; (vii) impose additional terms and conditions with respect to all Qualified Bids; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) seek to modify the Bidding Procedures or withdraw the Bidding Procedures Motion at any time with or without prejudice.

## C.      Conducting a Sale Pursuant to the Sale Procedures is in the Best Interests of the Debtor's Estate and Creditors

43.      The Debtor believes that the Sale and proposed Sales Procedures Notice will promote active bidding from seriously interested parties and will identify the best and highest offer(s) available for the Purchased Assets. The proposed Sale Procedures will allow the Debtor to conduct an Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtor believes that the Sale Procedures are (i) sufficient to encourage bidding for the Purchased Assets, (ii) consistent with other procedures previously approved by this Court, and (iii) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

44.      Most importantly, the Auction provides the only way for the Debtor, consistent with its fiduciary duties, to monetize the value of the Dealership for the benefit of not only all of

the creditors, but the Debtor's employees, who will be terminated if the Sale Motion is not

approved. Therefore, the granting of the Sale Motion not only provides the best method of

maximizing the estate's assets, but it will provide the Debtor's employees with a chance to

recoup lost wages and maintain their jobs.

**D.    Notice of the Sales Procedures and the Proposed Sale**

45.    For the reasons set forth in this Sale Motion, the Debtor wishes to proceed to the

Sale and Sale Hearing as expeditiously as the Court's calendar will allow, while providing the

requisite notice of the proposed Sale as required under Bankruptcy Rule 2002.

46.    In accordance with Bankruptcy Rule 2002, the Debtor proposes to give notice of

the Sales Procedures, and the proposed Sale by serving a Notice, substantially in the form

annexed hereto as Exhibit 1 to the Sale Procedures Order (the "Sale Procedures Notice"). The

Debtor proposes to place the Sale Procedures Notice into the Virtual Data Room and to serve the

Sale Procedures Notice by (A) electronic mail (via ECF) or overnight mail, upon: (i) the Office

of the United States Trustee; (ii) counsel to the DIP Lender; (iii) counsel to the Committee; (iv)

counsel to all parties to the proposed Assumed Contracts; (v) all applicable taxing and regulatory

authorities; and (vi) all parties that have filed a Notice of Appearance in these bankruptcy cases;

and (B) by first class mail, upon each Debtor's known creditors.

47.    Additionally, the Debtor will place two one-quarter page advertisements regarding

the sale of the Dealership in a nationally recognized dealer publication such as Automotive News

or the like.

48.    The Debtor submits that the foregoing notice is reasonably calculated to provide

timely and adequate notice of the Sale Procedures, the proposed sale and all proceedings to be

held thereon to the Debtor's creditors and other parties in interest, and also to those who have

expressed interest, or may express interest, in bidding on the Purchased Assets.

49.     Based upon the foregoing, the Debtor submits that the relief requested herein is

necessary and appropriate, is in the best interests of the Debtor and its estate and should be

granted in all respects.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

50.     The Debtor believes that its Executory Contracts and Unexpired Leases represent

valuable rights necessary to the continued operation of its business.  To that end, the Debtor

seeks to establish the following procedures permitting it to assume and assign certain of these

Executory Contracts and Unexpired Leases to the Successful Bidder and to notify counterparties

to such Executory Contracts and Unexpired Leases of proposed cure amounts, if any, necessary

to cure any defaults existing thereunder:

A.     Cure Notice: The Debtor shall, within five (5) business days of the entry
of the Sale Procedures Order, serve the Cure Notice upon each non-
Debtor counterparty to each Executory Contract or Unexpired Lease to
which the Debtor is a party that may be assumed and assigned to the
Stalking Horse Bidder, regardless of whether, at that time, the Executory
Contract or Unexpired Lease is listed as being proposed to be assumed
and assigned to the Stalking Horse Bidder. The Cure Notice shall state the
date, time and place of the Sale Hearing and the date by which any
objection to the assumption and assignment of such Executory Contract
or Unexpired Lease must be filed and served. The Cure Notice shall also
identify the amounts, if any, that the Debtor believes are owed to each
counterparty to an Executory Contract or Unexpired Lease to cure any
defaults that exist under such contract or lease (such amounts, the "Cure
Costs") pursuant to section 365 of the Bankruptcy Code. The Cure Notice
does not constitute an admission that an Executory Contract or Unexpired
Lease is in fact an executory contract or unexpired lease for the purposes
of section 365 of the Bankruptcy Code, and the Debtor reserves any and
all rights with respect to the Executory Contracts and Unexpired Leases.
The inclusion of an Executory Contract or Unexpired Lease on the Cure
Notice shall not obligate the Successful Bidder to take assignment of such
Executory Contract or Unexpired Lease. Only those contracts that
constitute (a) Buyer Assumed Agreements pursuant to the Stalking Horse

Agreement or (b) if the Successful Bidder is not the Stalking Horse Bidder, Buyer Assumed Agreements identified in the Successful Bidder's Proposed Asset Purchase Agreement, shall be assumed, assigned and sold to such Successful Bidder.

B.     <u>Cure Costs Objections</u>: If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to any proposed Cure Costs set forth in the Cure Notice or any Supplemental Cure Notice, such counterparty must (a) file with the Court a written objection (a "<u>Cure Costs Objection</u>") and (b) serve such Cure Costs Objection, so as to be received no later than ten (10) days after service of the Cure Notice or Supplemental Cure Notice, as applicable (the "<u>Cure Objection Deadline</u>"), on: (i) counsel to the Debtor; (ii) counsel to the Stalking Horse Bidder; (iii) the Office of The United States Trustee; and (iv) counsel to the Official Committee of Unsecured Creditors (collectively, the "<u>Notice Parties</u>").

If, at any time and from time to time after the entry of the Sale Procedures Order, the Debtor or the Stalking Horse Bidder or other Successful Bidder identify additional Executory Contracts or Unexpired Leases to be assumed and assigned as Buyer Assumed Agreements in accordance with the terms of the Stalking Horse Agreement or Successful Bidder's Proposed Asset Purchase Agreement, the Debtor shall serve a supplemental Cure Notice (the "<u>Supplemental Cure Notice</u>") by facsimile, electronic transmission, hand delivery or overnight mail on the applicable non-debtor counterparty and its counsel (if known) no later than ten (10) days before the closing ("<u>Closing</u>") of the Sale, or, if such Executory Contract or Unexpired Lease is identified less than ten (10) days prior to the Closing, by the date set forth on the Supplemental Cure Notice. Each Supplemental Cure Notice shall: (a) state the date, time and place of the Sale Hearing (or later hearing, if applicable); (b) state the date by which any objection to the assumption and assignment of such Buyer Assumed Agreement must be filed and served; and (c) identify the proposed Cure Costs, if any.

Each Cure Costs Objection must set forth with specificity each and every asserted default in any Executory Contract or Unexpired Lease and the monetary cure amount asserted by such counterparty to the extent it differs from the Cure Costs, if any, specified by the Debtor in the Cure Notice or Supplemental Cure Notice, as applicable.

C.     <u>Disputed Cure Costs</u>: In the event that the Debtor and the non-debtor party cannot resolve a Cure Costs Objection, disputed Cure Costs shall not be paid until the resolution of any such disputes by the Court or mutual agreement of the Debtor, with the consent of the Stalking Horse Bidder to the extent required in the Stalking Horse Agreement, and the objecting

party. Cure Costs Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing.

D.    Deemed Consent to Cure Costs: Any counterparty to an Executory Contract or Unexpired Lease that fails to timely file and serve a Cure Costs Objection shall be forever barred from asserting that Cure Costs are owed in an amount in excess of that set forth in the Cure Notice or Supplemental Cure Notice. If no Cure Costs Objection is timely filed and served by the Cure Objection Deadline with respect to a Buyer Assumed Agreement, the Cure Costs identified in the Cure Notice or Supplemental Cure Notice, as applicable, with respect to the Executory Contracts and Unexpired Leases shall be the only amounts necessary to be paid to cure all monetary defaults pursuant to section 365(b) of the Bankruptcy Code under such Buyer Assumed Agreement, to the extent the Stalking Horse Bidder (or other Successful Bidder) ultimately decides to have the applicable Buyer Assumed Agreement assumed and assigned to it. Any party failing to timely file a Cure Costs Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtor, its estate or the Successful Bidder, notwithstanding anything to the contrary in any Executory Contract or Unexpired Lease, or any other document. To the extent a Cure Costs Objection is resolved or determined unfavorably to the Debtor, the Debtor may, with the prior written consent of the Successful Bidder, seek to instead reject the applicable Executory Contract or Unexpired Lease after such determination.

E.    Assignment Objections: If any counterparty to an Executory Contract or Unexpired Lease objects to the assumption and assignment of such Executory Contract or Unexpired Lease for any reason (including with respect to adequate assurance of future performance) other than the amount of the proposed Cure Costs (an "Assignment Objection"), such counterparty must file and serve such Assignment Objection so as to be received by the Notice Parties by no later than ten (10) days after service of the Cure Notice or Supplemental Cure Notice, as applicable (the "Assignment Objection Deadline"). The Court shall make any and all determinations concerning an Assignment Objection, including adequate assurance of future performance under the Buyer Assumed Agreements pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code, at the Sale Hearing (or such later hearing as may be requested by the Debtor).  If no Assignment Objection is timely filed and served by the Assignment Objection Deadline, the counterparty to an Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption, assignment and sale of the Executory Contract or Unexpired Lease to the Successful Bidder if such Executory Contract or Unexpired Lease is elected by the Successful Bidder as a Buyer Assumed Agreement and shall be forever barred from asserting any objection with regard to such assumption, assignment and sale; provided, however, in the event that the

Successful Bidder is not the Stalking Horse Bidder, the non-debtor parties to the Executory Contracts and Unexpired Leases to be assumed and assigned to such Successful Bidder shall have until 4:00 p.m. on the date that is one (1) business day prior to the Sale Hearing to object to the assumption, assignment and/or sale of their Executory Contracts and Unexpired Leases to such Successful Bidder; provided further, however, any such objection may relate solely to adequate assurance of future performance by such Successful Bidder pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code.

F.    Addition or Removal of Certain Buyer Assumed Agreements: The Stalking Horse Bidder may add or remove any Assumed Contract to be assumed by the Debtor and assigned to the Stalking Horse Bidder at any time prior to five (5) days prior to the Sale Hearing in accordance with the terms of the Stalking Horse Agreement.

## THE STALKING HORSE AGREEMENT

51.    As set forth above, the Debtor entered into the Stalking Horse Agreement after extensive marketing efforts, negotiations, consideration and analysis, and submit that the terms of the Stalking Horse Agreement are fair and provide reasonable value in exchange for the Purchased Assets. By establishing a minimum acceptable bid for the Purchased Assets, the Stalking Horse Agreement, together with the Bidding Procedures, promote competitive bidding and will ensure that the Debtor maximizes the value received from the sale of the Purchased Assets.

52.    The Stalking Horse Agreement was negotiated, proposed, and entered into by the Debtor and Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions. In addition, the Debtor and Stalking Horse Bidder were each represented by sophisticated and experienced counsel and other advisors in the negotiation of the Stalking Horse Agreement.

## MATERIAL TERMS OF THE PROPOSED SALE[5]

53.     In accordance with Local Rule 6004-1(a)(3), the material terms of the proposed

sale to the Buyer (or other Successful Bidder for the Purchased Assets) are as follows:

- **Seller**.  The Debtor.

- **Property to be Sold**.    The Debtor's goodwill, "blue sky" and general
  intangibles, Operating Assets, and Motor Vehicle Inventory.

- **Date, Time and Place of Sale**.  No later than 75 days after December 9,
  2019.

- **Purchase Price**.  $27,500.000 plus adjustments based on the value of the
  Motor Vehicle Inventory and Parts Inventory actually acquired.

- **Conditions of the Sale**.  (a) The issuance and execution of a standard sales
  and service agreement from the Manufacturer, (b) Amendments to the
  existing leases for the dealership premises, or rejection of such leases and
  approval of a relocation plan, (c) 27 days due diligence for the Buyer.

- **Deadlines for Approval or Closing of Sale**.  No later than 75 days after
  December 9, 2019.

- **Deposit and Forfeiture of Deposit**.  Deposit of $1,250,000.00.  Forfeited
  upon material uncured breach by Buyer or failure by Buyer to close when
  required.

- **Request for a Tax Determination Under Section 1146(b) of the
  Bankruptcy Code**. The proposed Sale is not being effectuated pursuant to a
  plan. Thus, section 1146(b) of the Bankruptcy Code is inapplicable.

- **Retention / Access to Books and Records**.  No restriction upon Debtor's
  access to books and records.

- **Assumption and Assignment of Executory Contracts and Unexpired
  Leases**.  All contracts and leases primarily related to the Debtor's business,
  to the extent the Buyer elects in writing on or before the Closing Date to
  assume such contracts.

---

[5] The following summaries of the material terms of the proposed Sale and "special provisions" of the Stalking Horse
Agreement and Sale Order are provided in accordance with Local Rule 6004-1 and are qualified in their entirety by
reference to the provisions of the Stalking Horse Agreement and Sale Order. In the event of any inconsistencies
between these summaries and the actual provisions of the Stalking Horse Agreement and Sale Order, the terms of the
Stalking Horse Agreement and Sale Order shall govern in all respects. Capitalized terms used, but not otherwise
defined, in this section shall have the meanings ascribed thereto in the Stalking Horse Agreement.

- **Credit Bidding**.  Not Contemplated.

54.    In accordance with Local Rule 6004-1(b), the Stalking Horse Agreement and/or

the Sale Order, as applicable, include the following "special provision":

- **Sale to Insider**.    The Stalking Horse is not an insider.    There is no prohibition against an insider making a Qualified Bid.

- **Agreements with Management or Key Employees**: None other than that the Buyer shall offer employment to a sufficient number of the Debtor's employees that as of the Closing the Debtor shall not have any obligation to give notice under the federal or New Jersey "WARN" laws or regulations.

- **Waiver, Release or Satisfaction of Any Claim**: None.

- **Agreement to Limit Marketing or Not Solicit Competing Offers**: None.

- **Sale or Limitation of Right to Pursue Avoidance Actions**: None.

- **Limitation on Successor Liability**: The Debtor agrees to indemnify the Buyer for causes of action resulting from the Debtor's operation of the business prior to Closing.

- **Sale Free and Clear**: Sale is to be free and clear of any claims or interests including those that could be asserted under applicable New Jersey laws pertaining to notification of sale, transfer, or assignment in bulk, and of all liens, claims and encumbrances.

- **Relief from Bankruptcy Rules 6004(h) and 6006(d)**: Requested.

## BASIS FOR RELIEF REQUESTED

**I.    The Bidding Procedures are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

55.    The paramount goal of any proposed sale of property of a debtor's estate is to

maximize the value of the proceeds received by the estate. *See Official Committee of Unsecured*

*Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (the debtor has the

"fiduciary duty to maximize the value of the bankruptcy estate."); *Burtch et al. v. Ganz, et al. (In*

*re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to

protect and maximize the estate's assets."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65

(8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the

estate at hand.") (citing *Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway

Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's

central purposes, the maximization of the value of the bankruptcy estate for the benefit of

creditors."). To that end, courts have recognized that procedures established for the purpose of

enhancing competitive bidding are consistent with the fundamental goal of maximizing value of

a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy,

Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive

bidding provide a benefit to a debtor's estate); *see also In re Fin'l News Network, Inc.*, 126 B.R.

152, 156 (Bankr. S.D.N.Y. 1992) ("court-imposed rules for the disposition of assets . . . [should]

provide an adequate basis for comparison of offers, and [should] provide for fair and efficient

resolution of bankrupt estates.").

     56.     In this case, the proposed Bidding Procedures are appropriate under sections

105(a) and 363 of the Bankruptcy Code and will ensure that the bidding process is fair and

reasonable and will yield the maximum value for the Debtor's estate, creditors, stakeholders, and

other parties in interest. The Bidding Procedures are designed to maximize the value received for

the Purchased Assets by facilitating a fair and competitive bidding process in which all potential

bidders are encouraged to participate and submit competing bids. The Debtor, with the assistance

of its advisors, has structured the Bidding Procedures to attract competitive and active bidding

for the Purchased Assets. The Bidding Procedures will allow the Debtor to conduct an Auction,

if necessary, in a fair, controlled and transparent manner that will encourage participation by

financially capable bidders that demonstrate the financial wherewithal to close a transaction. The

Bidding Procedures provide the Debtor with the opportunity to consider all competing offers and to select, in its business judgment, the highest and best offer for the Purchased Assets. The Bidding Procedures further provide potential bidders with sufficient notice and an opportunity to obtain due diligence information necessary to submit a timely and informed competing bid.

57.    Notably, the Stalking Horse Agreement contains no prohibition on the Debtor's soliciting or receiving offers for the Purchased Assets and, accordingly, the Debtor is able to continue marketing such assets for sale even prior to entry of the Sale Procedures Order. Therefore, the Debtor and all parties in interest can be assured that the consideration ultimately received for the Purchased Assets as a result of the Bidding Process will not only be fair and reasonable but will reflect the maximum price that the market will bear for the Purchased Assets.

58.    Bidding procedures similar to those proposed herein are routinely approved by courts in this and other districts in large, complex bankruptcy cases. *See*, *e.g., In re East Orange General Hospital, Inc., et al.,* Case No. 15-31232 (VFP) (Bankr. D.N.J. Dec. 15, 2015); *In re Crumbs Bake Shop, Inc.*, Case No. 14-24287 (MBK) (Bankr. D.N.J. July 25, 2014); *In re Ashley Stewart Holdings, Inc., et al.*, Case No. 14-14383 (MBK) (Bankr. D.N.J. April 3, 2014); *In re Appvion, Inc.*, *et al.*, Case No. 17-12082 (KJC) (Bankr. D. Del. 2018 March 12, 2018); *KII Liquidating Inc. (f/k/a Katy Indus., Inc.)*, Case No. 17-11101 (KJC) (Bankr. D. Del. Jul. 18, 2017); *In re Aralez Pharmaceuticals US Inc., et al.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. October 11, 2018); *In re Gawker Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. July 8, 2016); I*n re The Great Atlantic & Pacific Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2015).

59.      Accordingly, the Debtor submits that the Bidding Procedures should be approved as reasonable, appropriate, and in the best interests of the Debtor, its creditors, estate and all parties in interest.

## II.      The Bid Protections Are Appropriate Under the Circumstances and Should Be Approved.

60.      As described above, the Stalking Horse Agreement provides for certain Bid Protections for the Stalking Horse Bidder triggered under certain limited circumstances described herein and set forth in the Stalking Horse Agreement. Approval of expense reimbursements and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases and is oftentimes, as it is here, a necessary component of such sales because it assures the debtor a locked-in committed floor price.

61.      To compensate the Stalking Horse Bidder for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtor seeks authority to provide the Stalking Horse Bidder with the Bid Protections in the event it is not the Successful Bidder. The Debtor believes that (i) the Bid Protections are reasonable, given the significant benefits to the estate and this Chapter 11 Case of having a definitive Stalking Horse Agreement in place and the risk to the Stalking Horse Bidder that a third-party offer ultimately may be accepted by the Debtor, and (ii) the Bid Protections are necessary and, in fact, critical, to preserve and enhance the value of the Debtor's estate.

62.      Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. *See*, *e.g.*, *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill. Aug. 9, 2002)

34

(approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Integrated Resources*, 147 B.R. 650, 660 (Bankr. S.D.N.Y. 1992) (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

63.     Historically, bankruptcy courts approved bidding incentives similar to the proposed Bid Protections under the "business judgment rule," which proscribes judicial second-guessing of the actions of an entity's board taken in good faith and in the exercise of honest judgment. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

64.     Under the "business judgment rule," the Bid Protections contemplated by the Stalking Horse Agreement are appropriate. The Stalking Horse Agreement and Bid Protections are the product of extensive good faith, arms'-length negotiations between the Debtors and the Stalking Horse Bidder. The Bid Protections are fair and reasonable in amount, particularly in

light of the Stalking Horse Bidder's efforts to date and the risk to the Stalking Horse Bidder of

being used as a "stalking horse" for others to bid against.

65.    The United States Court of Appeals for the Third Circuit established standards for

determining the appropriateness of expense reimbursement and other financial protections in the

bankruptcy context in *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl. Energy,

Inc.)*, 181 F.3d 527 (3d Cir. 1999). *See also In re Reliant Energy Channelview LP*, 594 F.3d 200

(3d Cir. 2010). In *O'Brien*, the Third Circuit identified at least two instances in which an award

of an expense reimbursement may benefit the estate. First, an expense reimbursement may be

necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive

bidding, such as by inducing a bid that otherwise would not have been made and without which

bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, if the availability of

expense reimbursements were to induce a bidder to research the value of the debtor and convert

the value to a dollar figure on which other bidders can rely, the bidder may have provided a

benefit to the estate by increasing the likelihood that the price at which the debtor is sold will

reflect its true worth. *Id.* The Third Circuit held that although payment of expense

reimbursements is measured against a business judgment standard in non-bankruptcy

transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code

govern in the bankruptcy context. Therefore, to be approved, the debtor must demonstrate that

the expenses to be reimbursed provide a benefit to its estate. *Id.* at 533.

66.    Here, the Bid Protections have enabled the Debtor to secure a substantial sale

price floor for the Purchased Assets – approximately $27,500,000 – and require that competing

bids be materially higher or otherwise better than the Stalking Horse Bid – a clear benefit to the

Debtor's estate. In addition, as noted above, the Bid Protections were ***a condition of the Stalking***

***Horse Bidder for its entry into the Stalking Horse Agreement*** and agreeing to act as the

Stalking Horse Bidder.

67.     Without the commitment of the Stalking Horse Bidder under the Stalking Horse

Agreement, the Debtor will lose the opportunity to test the Stalking Horse Bid for the Purchased

Assets in the marketplace and the downside protection afforded by the Stalking Horse Bid.

Furthermore, without the benefit of the Stalking Horse Bid, there can be no assurance that the

Debtor would receive a bid equal to that offered by the Stalking Horse Bidder. Notably, during

the prepetition marketing process, no bidder submitted a bid that did not include payment of bid

protections to that bidder.

68.     The Debtor submits that the Bid Protections satisfy both the historical "business

judgment rule" and the Third Circuit's "administrative expense" standard for approval. The

Debtor reasonably believes that it is necessary to ensure the Stalking Horse Bidder's willingness

and desire to proceed with the Stalking Horse Agreement, and therefore, agreed to the Bid

Protections. The Stalking Horse Agreement containing the Bid Protections will serve as a

minimum bid for the Purchased Assets on which other potential bidders can present higher and

better offers, thereby maximizing value for the Debtor's estate and increasing the likelihood that

the price ultimately obtained for the Purchased Assets will reflect their true value. Additionally,

the Bid Protections will be paid only from the sale proceeds actually received by the Debtor from

the closing of a higher or better transaction.

69.     In addition, the Bid Protections are actual and necessary to preserve and enhance

the value of the Debtor's estate. But for the Bid Protections, the Stalking Horse Bidder would not

have entered into the Stalking Horse Agreement. In the absence of a stalking horse bidder, the

Auction would be imperiled, with no one party willing to be bound to a baseline bid. Finally, the

amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the

proposed Sale and the efforts that have been and will be expended by the Stalking Horse Bidder.

70.     Courts in the Third Circuit and elsewhere have regularly approved stalking horse

protections similar to the Bid Protections in other chapter 11 cases. *See*, *e.g.*, *In re Revel AC,*

*Inc.*, No. 14-22654 (GMB) (Bankr. D.N.J. September 15, 2014) (Doc. No. 625) (approving bid

protection of $3 million (approximately 3.3%) in connection with $90 million sale of assets); *In*

*re Ashley Stewart Holdings, Inc.*, Case No. 14-14383 (MBK) (Bankr. D.N.J. April 3, 2014) (Doc.

No. 192) (approving expense reimbursement of up to $400,000 in connection with $18 million

sale of assets); *In re Crumbs Bake Shop, Inc.*, No. 14-24287 (MBK) (Bankr. D.N.J. July 25,

2014) (Doc. No. 79) (approving expense reimbursement of up to $125,000 in connection with a

credit bid sale of assets); *In re Zloop, Inc.*, Case No. 15-11660 (KJC) (Bankr. D. Del. May 16,

2016) (Doc. No. 468) (approving expense reimbursement of up to $75,000 in connection with

$1.4 million sale of assets); *In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. July

7, 2015) (Doc. No. 572) (authorizing expense reimbursements of $100,000 in connection with

$12 million sale of assets and $82,000 in connection with $4.1 million sale of assets); *In re Old*

*FOH Inc. (f/k/a Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (Bankr. D. Del. May 6,

2015) (Doc. No. 120) (authorizing a termination fee of $775,000 and an expense reimbursement

of up to $300,000 in connection with $22.5 million sale of assets); *In re Vertis Holdings, Inc.*,

Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (Doc. No. 206) (approving expense

reimbursement of up to $2.5 million in connection with a $258.5 million sale of assets); *In re*

*Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (Doc. No. 1113)

(approving expense reimbursement of up to $500,000 in connection with an approximate $90

million sale of assets); *In re Conex Holdings, LLC*, Case No. 11-10501 (CSS) (Bankr. D. Del.

Sept. 14, 2011) (Doc. No. 132) (approving expense reimbursement of 3% of final purchase price). *See also In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016) (Doc. No. 1032) (approving expense reimbursement of up to $4.5 million in connection with $144 million sale); *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 11, 2013) (Doc. No. 2275) (approving expense reimbursement of no less than 3% of cash amount of purchase price).

71.    In sum, the Debtor respectfully submits that the Bid Protections enable the Debtor to ensure a sale to a contractually committed bidder at a price that is market-tested, fair and reasonable, while providing the Debtor with an opportunity to enhance value through an auction process that will be more robust due to the presence of a firm and committed baseline bid. Accordingly, the Bid Protections should be approved.

**III.    Approval of the Sale is Warranted under Section 363(b) of the Bankruptcy Code as a Sound Exercise of the Debtor's Business Judgment.**

72.    Section 363(b) of the Bankruptcy Code provides that a debtor may, "after a notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

73.    While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363(b), courts uniformly agree that the business judgment standard applies. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Courts typically apply four factors in determining whether a section 363 sale is appropriate under the business judgment standard—namely, whether: (a) a sound business

justification exists for the sale; (b) adequate and reasonable notice of the sale was provided to

interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d)

the parties have acted in good faith. *Id.* at 1070 (setting forth the "sound business" purpose

standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); *In re*

*Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002)

(adopting *Lionel* factors) (citing *Guilford Transportation Industries, Inc. v. Delaware & Hudson*

*Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing

nonexclusive factors that may be considered by a court in determining whether there is a sound

business purpose for an asset sale)). When a debtor demonstrates a valid business justification

for a decision, the presumption is that the business decision was made "on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the company."

*Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*,

147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.

1985)).

74.    A sound business justification exists where a sale of the debtor's assets is

necessary to preserve the value of the debtor's estate. *See*, *e.g.*, *In re Delaware & Hudson Ry.*

*Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a

valid business purpose . . ."); *Lionel*, 722 F.2d at 1071 (adopting a rule "requiring that a judge

determining a § 363(b) application expressly find from the evidence presented before him . . . a

good business reason to grant" the sale).

75.    The Debtor has articulated a clear business justification for entering into the

proposed Sale. As explained in greater detail above, the Debtor has determined in its business

judgment that a sale of the Purchased Assets, conducted in accordance with the Bidding

Procedures, will maximize value and is in the best interests of the Debtor, its creditors, estate,

stakeholders, and other parties in interest. The Debtor evaluated all alternatives and determined

that a sale as a going concern which would result in continued employment for virtually all of

their employees would maximize value for all stakeholders. Accordingly, a sound business

justification exists for the Sale of the Purchased Assets pursuant to the Bidding Procedures.

76.     The Bidding Procedures were carefully designed to yield the maximum value for

the Debtor's estate and creditors. The Debtor constructed the Bidding Procedures to encourage

competitive bidding, while giving the Debtor the opportunity to review and analyze all

competitive bids only from Qualified Bidders, who will have been vetted prior to the Auction.

These carefully constructed measures will prevent any bid that does not constitute a fair and

adequate purchase price for the Purchased Assets.

77.     Finally, both the Debtor and the Stalking Horse Bidder were represented by

experienced advisors and attorneys in the arm's-length negotiation of the Stalking Horse

Agreement, and the Debtor and Stalking Horse Bidder are proceeding in good faith.

Accordingly, the relief sought herein is a valid exercise of the Debtor's business judgment and

should be approved under section 363(b) of the Bankruptcy Code.

## IV.     The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of All Liens, Claims and other Liabilities, Including Successor Liability Claims.

78.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of all liens, claims, interests and encumbrances provided that one of the following

conditions are met:

      a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

      b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5).

79.     Because section 363(f) of the Bankruptcy Code is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that court may approve sale "free and clear" provided at least one of the subsections of section 363(f) is met); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met"); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

80.     The Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the Sale of the Purchased Assets pursuant to the Stalking Horse Agreement. In particular, the Debtor believes that TMCC will agree to the Sale and that the proposed Sale will generate more than sufficient proceeds to satisfy the other valid secured claims against the Purchased Assets. In addition, all parties known to have asserted a lien or other encumbrance on the Purchased Assets will receive notice of the Sale. To the extent they have not objected by the Sale Objection Deadline, they will be deemed to have consented to the Sale free and clear of all Liens, Claims and other Liabilities (except as otherwise provided in the Stalking Horse Agreement or other definitive purchase agreement) pursuant to section 363(f)(2). Further, where consent is not obtained, a sale free and clear can proceed pursuant to section 363(f)(5) of the

Bankruptcy Code because the relevant lien or other encumbrances will attach to the proceeds of

the Sale with the same validity, priority, and force and effect as such lien or encumbrance had

immediately prior to the closing of the Sale, and the Debtor will establish at the Sale Hearing that

the relevant creditors can be compelled to accept a monetary satisfaction of their respective

claims. Accordingly, section 363(f) authorizes the Sale of the Purchased Assets free and clear of

all Liens, Claims and other Liabilities (except as otherwise provided in the Stalking Horse

Agreement or other definitive purchase agreement).

81.     The Debtor further submits that it is appropriate to sell the Purchased Assets free

and clear of successor liability relating to the Purchased Assets. Such limitations on successor

liability will ensure that the Successful Bidder is protected from any claims or lawsuits

premised on the theory that the Successful Bidder is a successor in interest to the Debtor. If

such relief is not granted, the purpose of a "free and clear" sale of assets under section 363 of

the Bankruptcy Code could be frustrated by the potential for claimants to thereafter use the

transfer of assets as a basis to assert claims against the Successful Bidder arising from the

Sellers' pre-sale conduct. Moreover, without such assurances, the Debtor would run the risk that

potential bidders may not enter the Auction or, if they did, would do so with reduced bid

amounts. Under section 363(f) of the Bankruptcy Code, potential purchasers are entitled to

know that the Debtor's assets are not infected with latent claims that will be asserted against the

purchaser after the proposed transaction is completed.

82.     Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes such assets free and clear from successor liability relating to the debtor's

business. *See, e.g., In Matter of Motors Liquidation Co.*, No. 15-2844-BK(L), 2016 WL 3766237

(2d Cir. July 13, 2016), *12, *13 ("We agree that successor liability claims can be 'interests'

when they flow from a debtor's ownership of transferred assets" and holding that "a bankruptcy

court may approve a § 363 sale 'free and clear' of successor liability claims if those claims flow

from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to

payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly

giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n*

*personam* claims, including any potential state successor or transferee liability claims against

New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore

extinguished by the Sale."); *The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195

B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell

assets free and clear of any interest that could be brought against the bankruptcy estate during the

bankruptcy).

83.     For these reasons, the Successful Bidder should not be liable under any theory of

successor liability relating to the Purchased Assets, but instead, should hold the Purchased Assets

free and clear of all Liens, Claims and other Liabilities (except as otherwise provided in the

Stalking Horse Agreement or other definitive purchase agreement), including successor liability

claims.

## V.     The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.

84.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a

debtor's assets to a good faith purchaser. Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).

85.    While the Bankruptcy Code does not define good faith, the Third Circuit has held

that indicia of bad faith typically include "fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn.,*

*Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter*

*Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983) (other citations omitted)); *see also Kabro Assoc. of West*

*Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997)

(noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a

judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee or

an attempt to take grossly unfair advantage of other bidders.").

86.    As set forth in detail above, the Stalking Horse Agreement was negotiated at

arm's-length and without collusion, with all parties represented by their own sophisticated

counsel and advisors. In addition, the Stalking Horse Bidder is not an "insider" or "affiliate" of

the Debtor, as those terms are defined in section 101 of the Bankruptcy Code. Accordingly, the

Debtor requests that the Sale Order include a finding that the Successful Bidder is a "good faith"

buyer within the meaning of section 363(m) of the Bankruptcy Code. The Debtor believes that

providing the Successful Bidder with such protection will ensure that the maximum price for the

Purchased Assets will be received by the Debtor and that the closing of the Sale will occur

promptly.

87.    In addition, neither the Debtor nor the Stalking Horse Bidder have engaged in any

conduct that would cause or permit the Stalking Horse Agreement to be avoided under section

363(n) of the Bankruptcy Code. If, following the Auction, the Stalking Horse Bidder is not the

Successful Bidder, the Sellers will have negotiated a purchase agreement with the Successful

Bidder in good faith and at arms'-length. Additionally, the Bidding Procedures are designed to

prevent the Debtor or the Successful Bidder (or the Back-Up Bidder as defined in the Bidding

Procedures) from engaging in any conduct that would cause or permit the Stalking Horse

Agreement or the Sale of the Purchased Assets to be avoided under section 363(n) of the

Bankruptcy Code.

## VI.   Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

88.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is

whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.,*

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095,

1098 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or

debtor in possession, subject to the approval of the bankruptcy court, to go through the inventory

of executory contracts of the debtor and decide which ones it would be beneficial to adhere to

and which ones it would be beneficial to reject").

89.     The business judgment test "requires only that the trustee [or debtor in

possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel*

*Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the

administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th

Cir. 1985).

90.    Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any

executory contract provide "adequate assurance of future performance . . . whether or not there

has been a default in such contract." 11 U.S.C. § 365(f)(2). Section 365(b), which codifies the

requirements for assuming an executory contract or unexpired lease, provides, in pertinent part

that the debtor may only assume an executory contract or unexpired lease if it:

> (A)    cures, or provides adequate assurance that the [debtor] will promptly cure,
> [any defaults existing under the contract or lease];
>
> (B)    compensates, or provides adequate assurance that the [debtor] will
> promptly compensate, a party other than the debtor to such contract or
> lease, for any actual pecuniary loss to such party resulting from such
> default; and
>
> (C)    provides adequate assurance of future performance under such contract or
> lease.

11 U.S.C. § 365(b)(1).

91.    While undefined by the Bankruptcy Code, adequate assurance is guided by "a

practical, pragmatic construction based upon the facts and circumstances of each case." *Carlisle*

*Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

(quoting *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill.

1995)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that

the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the

Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by

commercial rather than legal standards . . . [and] factual considerations."). While no single

standard governs every case, adequate assurance "will fall considerably short of an absolute

guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538. Adequate assurance may

be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code.)

92.     The Debtor requests approval under section 365 of the Bankruptcy Code of the Debtor's assumption and assignment of certain Executory Contracts and Unexpired Leases to the Stalking Horse Bidder or other Successful Bidder. The Debtor further requests that the Sale Order provide that the Buyer Assumed Agreements will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or other Successful Bidder notwithstanding any provisions in such contracts or leases, including those described in sections 365(f)(1) and (f)(3) of the Bankruptcy Code, that may prohibit such assignment.

93.     The Bidding Procedures specifically require any Qualified Bid to contain information concerning a Qualified Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases to be assumed and assigned under such bid. Counterparties to the Buyer Assumed Agreements who are unsatisfied with the proposed adequate assurance of future performance by the Successful Bidder will be able to file an objection with respect thereto.

94.     To the extent necessary, the Debtor will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Stalking Horse Bidder or other Successful Bidder to perform under the Buyer Assumed Agreements. The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the

48

Successful Bidder to provide adequate assurance of future performance as required under section 365(f)(2)(B) of the Bankruptcy Code.

95.    Further, as set forth above, the Cure Notice to be sent to all parties to Buyer Assumed Agreements will include the amounts the Debtor believes are necessary to cure any defaults under the Buyer Assumed Agreements in accordance with section 365(b) of the Bankruptcy Code. Accordingly, the Debtor has satisfied the requirements of section 365 of the Bankruptcy Code with respect to the assumption and assignment of the Buyer Assumed Agreements.

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

96.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtor seeks a waiver of any stay of the effectiveness of the Sale Order. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court order otherwise."

97.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtor's estate for the benefit of its economic stakeholders. Accordingly, the Debtor submits that ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that each such rule applies.

## WAIVER OF MEMORANDUM OF LAW

98.    Because the legal basis upon which the Debtor relies is incorporated herein and the Application does not raise any novel issues of law, the Debtor respectfully requests that the

Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR

9013-1(a)(3).

## NO PRIOR REQUEST

99.     The Debtor has not made any prior request to this or to any other court for the

relief sought herein.

## NOTICE

100.     Notice of this Motion has been given to (i) the Newark Office of the United States

Trustee for Region III; (ii) counsel to the Creditors' Committee; (iii) counsel to Toyota Motor

Credit Corporation; and (iv) all parties filing an entry of appearance and request for notices

pursuant to Rule 2002 of the Bankruptcy Rules.  In light of the nature of the relief requested

herein, the Debtor respectfully submits that no other or further notice is required.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, (i) approving the Sales Procedure Notice, approving bidding procedures and protections in connection therewith, together with such other and further relief as the Court deems appropriate.

Dated:  December 9, 2019                    Respectfully submitted,

                                            **ARENT FOX LLP**

                                            ___/s/ Robert M. Hirsh_____
                                            Robert M. Hirsh, Esq.
                                            Russell P. McRory, Esq. (admitted *pro hac vice*)
                                            1301 Avenue of the Americas
                                            New York, NY 10019-6022
                                            Telephone: (212) 484-3900
                                            Facsimile: (212) 484-3990
                                            Email: robert.hirsh@arentfox.com
                                            Email: russell.mcrory@arentfox.com

                                            *Proposed Counsel to the Debtor and Debtor-in-Possession*